IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

ANTHONY BYRD,

    Petitioner,

v.

UNITED STATES OF AMERICA,

    Respondent.

Case No. 2:19-CV-4266
Judge James L. Graham
Magistrate Judge Chelsey M. Vascura

## ORDER and REPORT AND RECOMMENDATION

Petitioner, a state prisoner represented by counsel, has filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254. (ECF No. 1.) Petitioner seeks release from confinement pursuant to a state court-judgment in a criminal action. This case has been referred to the undersigned pursuant to 28 U.S.C § 636(b) and Columbus' General Order 14-1 regarding assignments and references to United States Magistrate Judges.

The docket reflects that Petitioner has paid the required filing fees.

Pursuant to Rule 4 of the Rules Governing Section 2254 Cases in the United States District Court ("Rule 4"), the Court must conduct a preliminary review to determine whether "it plainly appears from the petition and any attached exhibits that the [Petitioner] is not entitled to relief in the district court." If it does so appear, the petition must be dismissed. *Id*. Rule 4 allows for the dismissal of petitions which raise legally frivolous claims, as well as petitions that contain factual allegations that are palpably incredible or false. *Carson v. Burke*, 178 F.3d 434, 436–37 (6th Cir. 1999).

For the reasons that follow, it plainly appears that Petitioner's Fourth Amendment claim is not cognizable. Accordingly, the undersigned **RECOMMENDS** that this claim action be

**DISMISSED**.  As described below, however, Respondent is **ORDERED** to file an answer, motion, or other response to Petitioner's remaining claim in accordance with Rule 5 of the Rules Governing Section 2254 Cases in the United States District Court ("Rule 5") within **SIXTY (60) DAYS** of the date that this Order and Report and Recommendation is filed.  Petitioner shall have **TWENTY-ONE (21) DAYS** after Respondent responds to the petition to file a Reply.

## I.    RELEVANT BACKGROUND

The state appellate court summarized the facts and procedural history of this case as follows:

> By indictment filed April 24, 2014, . . . State of Ohio, charged [Petitioner] with one count of possession of marijuana, in violation of R.C. 2925.11, a second-degree felony; and one count of trafficking in marijuana, in violation of R.C. 2925.03, a second-degree felony.  The indictment charged [Petitioner] along with two codefendants, Cameron E. Jackson and Ronald L. Hayward.  [Petitioner] entered a plea of not guilty.
>
> . . . On July 18, 2014, [Petitioner] filed a motion to suppress any physical evidence and statements obtained by police as a result of his detention, arguing law enforcement officers conducted an unconstitutional warrantless search. The state filed a memorandum contra [Petitioner's] motion to suppress, and the trial court set the matter for hearing.
>
> . . . At a suppression hearing on June 8 and 9, 2015, Officer Stephen Carr of the Columbus Division of Police testified that around 3:15 a.m. on April 14, 2014, he responded to a dispatch of a possible theft in progress at a commercial trucking terminal located at 1929 Lone Eagle Street.  Officer Carr testified the information he had on arriving at the scene was that a truck driver at the trucking terminal saw several men removing cargo from a detached trailer and placing the cargo into two rental trucks.  Before Officer Carr arrived, an unmarked cruiser entered the trucking terminal and observed the rental vehicles but did not observe any people.  Officer Carr then arrived on the scene in a marked cruiser and he said a man named David Cline flagged him down and identified himself as the person who called 911 to report the possible theft and that Cline told him it was very unusual for anyone to be unloading anything at that time of day.  Cline said he saw three men moving cargo from a trailer into two Penske rental trucks.
>
> . . . When he found the trailer and the two rental vehicles, Officer Carr said he observed [Petitioner], Hayward, and Jackson "casually just standing there," and when the officers told the men they were there to investigate a possible theft, the

three men denied there was anything of that nature going on . . . . Officer Carr said Hayward did most of the talking. Hayward told the officers the men had been "contracted" to unload the trailer, but when officers asked them who owned the trailer, the men could not name the owner . . . . Officer Carr further testified there were very large crates of watermelons sitting in the grassy area behind the trailer but when he asked the men what they were doing with the produce, the men gave a vague response about unloading the produce into the grass and possibly putting it on the loading dock later.

. . . Officer Carr testified that the men told him that a man who worked security for the trucking terminal, "a guy named Bob," knew they were there and that "it was completely okay for them to be there." . . . Officer Carr then went to a mobile home parked at the entrance of the trucking terminal, and the occupant of that mobile home put Officer Carr in touch with the person who runs the trucking terminal. Approximately one-half hour later, the manager of the trucking terminal, whom Officer Carr identified as Mr. Seymour, arrived at the scene.

. . . In the time it took for Seymour to arrive at the scene, Officer Carr said he and the other officers "kind of stood around" with [Petitioner], Hayward, and Jackson and engaged in "very casual conversation," noting that the three men "didn't seem very concerned about [police] being there." . . . Officer Carr said the three men provided police with their identification cards. Additionally, Officer Carr said Hayward spent some time on the phone trying to get in contact with the person Hayward said had contracted the men to unload the truck. Officer Carr said the three men would have been free to leave during this approximately 30–minute period while everyone waited for Seymour to arrive "[i]f they wished to."

. . . Once Seymour arrived at the trucking terminal, the police officers allowed Seymour to talk to [Petitioner], Hayward, and Jackson to discern whether the three men had leased a space on the lot or were working for someone who had leased a space. After a brief conversation, Seymour went to look at some paperwork in his office and then told police the three men "did not know anything about the owner of the trailer." . . . Officer Carr said Seymour also told him that it was unusual to unload crates into wet grass.

. . . Officer Carr testified that there were two Penske rental vehicles parked near the trailer: a box truck with no windows and a cargo van. The officers asked [Petitioner], Hayward, and Jackson about the rental vehicles several times and whether they were loading cargo into those vehicles "and each time the answer was, no, they had nothing to do with the rental trucks." . . . Officer Carr testified that "with the totality of everything that was in front of me unable to identify the owner of the trailer, unable—this security person was not existing and the person that ran the dock saying that this simply did not look right to him," he and the other officers "believed there was an indeed a distinct possibility a theft was occurring." At that point, Officer Carr said he opened the back of the box truck "expecting to find crates of watermelons," but instead "found very large plastic wrapped packages that

were numbered like they were in an exact sequence," and Officer Carr recognized the packages immediately as the typical packaging of narcotics . . . . Officer Carr said the packages "were wrapped very well," and that even though he was "pretty sure at that point they were marijuana," he "couldn't even smell" anything from the packages . . . . Officer Carr reiterated that he opened the box truck at that point because "based on everything we had, we believed that the cargo was indeed being stolen" and that the three men were putting something into the rental vehicles . . . .

. . . After opening the box truck, the police officers detained [Petitioner], Hayward, and Jackson and placed each of them in a separate police cruiser. Officer Carr said he had a discussion with the other officers after the fact that if [Petitioner], Hayward, and Jackson had simply gotten in a car and drove away before officers opened the box truck, the officers would not have been able to stop them. Officer Carr testified that "[u]p to that point [when officers actually detained the three men, the officers] did not feel the need to detain anybody."

. . . After he looked in the box truck and detained [Petitioner], Hayward, and Jackson, Officer Carr testified he walked to the front of the rental van and, using his flashlight, looked in the windshield and "saw similar looking bundles in the back of the van that matched what [he] saw in the back of the box truck." . . . The cargo van did not have any windows on the rear side, but Officer Carr testified you could see to the back of the vehicle by looking through the windshield. A short time later, the K–9 unit arrived, and the K–9 "[i]mmediately alerted" on the rental vehicles . . . . Eventually, the narcotics detectives came to the scene and "drew up a search warrant," at which point Officer Carr was relieved of his duties . . . . Jackson had been seated in the back of Officer Carr's cruiser but police moved him to a different cruiser so that Officer Carr could leave the scene. While he was driving to the substation, however, Officer Carr said he heard something fall in the back seat and he pulled over, finding a key for a Penske vehicle.

. . . On cross-examination, Officer Carr said he did not believe there was an immediate risk that any potential evidence inside the box truck would be destroyed or moved away because he "didn't know it was evidence until [he] looked in" the box truck . . . . Officer Carr also agreed that he wrote in his report of the incident that he had a "reasonable suspicion to believe that cargo was being stolen" at the time he opened the box truck . . . . Officer Carr further stated there was no smell of marijuana in the trucking terminal. Additionally, Officer Carr estimated that from the time he first arrived on the scene to when he opened the box truck, more than one hour had elapsed.

. . . Officer Joshua Kinzel of the Columbus Division of Police testified that when he arrived at the trucking terminal, he saw approximately 100 watermelons lying all over the ground by the detached trailer. Officer Kinzel said that when officers asked the three men questions, it was Hayward who gave "actual answers" and that [Petitioner] and Jackson "kind of followed suit with whatever [Hayward] said" by nodding their heads . . . . Officer Kinzel said the three men were free to leave up

4

until the point when the officers found the marijuana in the back of the box truck. When Officer Kinzel asked the men about the rental vehicles, he said that Hayward told him "they don't know anything about the trucks," and that none of the three men indicated that the rental vehicles belonged to them . . . . Officer Kinzel could not recall whether [Petitioner] or Jackson ever gave a verbal response denying any connection to the rental trucks. Officer Kinzel testified that he, along with Officer Carr, made the collective decision to open the box truck together. However, Officer Kinzel testified his primary reason for opening the box truck was for officer safety, though he agreed that approximately one and one-half hour passed from the time he first arrived to the time the officers opened the box truck. Officer Kinzel testified that one of the other officers, Officer Tonya Allen, heard a rolling overhead door shut as soon as the officers arrived on the scene, and because of that, the officers "didn't know if there was somebody else in the truck."

. . . [Petitioner] testified that his friend, Shaunika Eakins, rented the box truck and cargo van in her name but that [Petitioner] paid for the rental of the vehicles. He said it was his understanding that even though his name was not on the rental agreement, he controlled the rental vehicles. Further, [Petitioner] said he never denied affiliation with the rental vehicles to police.

. . . After the suppression hearing, on July 6, 2015, the trial court denied [Petitioner]'s motion to suppress. The trial court stated its decision relied upon Officer Carr's testimony, which the trial court "found to be the most credible." . . . Specifically, in denying [Petitioner]'s motion to suppress, the trial court stated:

> . . . Detective Carr also stated that on cross-examination from Mr. [Petitioner]'s attorney, that what constituted criminal activity, he thought, was the 9–1–1 call, no legitimate explanation for being there, and the conversation with Mr. Seymour that things didn't look right. He also based his reasonable suspicions on cross from Mr. Hayward's attorney stating that he was unable to—the defendants were unable to ID the trailer owner, that there was no security person named Bob that they said it was okay for them being there, and that Mr. Seymour also said things did not look right. Further, he based his reasonable suspicions on Mr. Jackson's attorney, on Mr. Cline stating that there was unusual activity for that time of day and that Mr. Seymour said something was not right and was unusual. Therefore, there was reasonable suspicion to look in the box truck and the van.

. . . The trial court further stated that after the officers looked in the box truck and van, there was probable cause to arrest [Petitioner], Hayward, and Jackson.

. . . The matter then proceeded to a joint jury trial for all three defendants beginning October 5, 2015. The evidence at trial largely duplicated the evidence presented at the suppression hearing, though additional witnesses testified at trial. Specifically,

5

Claude W. Seymour, Jr., the manager of the trucking yard who goes by the name Wes, did not testify at the suppression hearing but did testify at trial. Seymour testified that ordinarily a trailer would be backed up to the dock so that a forklift could access the inside of the trailer to unload it. However, Seymour said that the way the trailer that [Petitioner], Hayward, and Jackson were unloading was positioned with the rear of the trailer abutting a wet, grassy area, there would be no way to use a forklift to unload it. Seymour recalled one of the defendants, though he was not sure which one, telling him they planned to use a forklift to reload the trailer. Seymour said that statement did not make sense to him given the location of the trailer.

. . . The state also presented evidence at trial regarding the amount of marijuana found at the scene. Police recovered a total of 122 packages of marijuana. Of that total, 66 packages came from the box truck, 46 packages came from the van, and 10 packages came from the trailer, in the bottom of a large box concealed by watermelons. All together, the packages weighed approximately 2,900 pounds. Further testing revealed the packages contained a total of 44,000 grams of marijuana.

. . . At the conclusion of the trial, the jury returned verdicts against [Petitioner], Hayward, and Jackson, finding them guilty of possession of marijuana and trafficking in marijuana. After a November 4, 2015 sentencing hearing, the trial court merged the possession count into the trafficking count and sentenced [Petitioner] to 8 years' imprisonment and imposed a 12–month driver's license suspension and a $7,500 fine. The trial court journalized [Petitioner]'s convictions and sentence in a November 4, 2015 judgment entry.

. . . [Petitioner] appealed, arguing that the trial court erred in denying the motion to suppress. This court agreed with [Petitioner], concluding the trial court erred in applying the reasonable suspicion standard to the search of the box truck and that the trial court should have determined whether there was probable cause to search the box truck under the automobile exception to the warrant requirement. *State v. Byrd*, 10th Dist. No. 15AP–1091, 2016–Ohio–7670, ¶ 24–26 ("*Byrd I* "). We remanded the case for the trial court to "make the appropriate factual findings relevant to a probable cause analysis for the search of the box truck and then determine, in the first instance, whether officers had probable cause to search the box truck." *Id.* at ¶ 27.

. . . On remand, the trial court once again denied [Petitioner]'s motion to suppress. The trial court issued a written order and entry on March 30, 2017 concluding "[t]he totality of the circumstances leading up to the opening of the box truck gave the officers ample probable cause to believe that the box truck would contain contraband and search the box truck under the automobile exception." . . . In denying [Petitioner]'s motion to suppress, the trial court additionally concluded the officers had probable cause for their subsequent search of the cargo van.

> . . . Subsequently, on May 1, 2017, the trial court issued an amended judgment entry noting it had overruled [Petitioner]'s motion to suppress on remand and reinstating [Petitioner]'s original judgment of conviction entered November 4, 2015. [Petitioner] timely appeals.
>
> **II. Assignments of Error**
>
> . . . [Petitioner] assigns the following errors for our review:
>
> [1.] The trial court erred by denying [Petitioner]'s motion to suppress evidence that police obtained in violation of his right against unreasonable searches and seizures guaranteed by the Fourth Amendment to the United States Constitution and Section 14, Article I of the Ohio Constitution.
>
> [2.] [Petitioner]'s convictions for trafficking marijuana and possession of marijuana are based on insufficient evidence, in violation of the Due Process Clause of the Fifth and Fourteenth Amendments to the United States Constitution and Sections 1 & 16, Article I of the Ohio Constitution.
>
> [3.] [Petitioner]'s convictions for trafficking marijuana and possession of marijuana are against the manifest weight of the evidence in violation of the Due Process Clause of the Fifth and Fourteenth Amendments to the United States Constitution and Sections 1 & 16, Article I of the Ohio Constitution.
>
> [4.] The trial court unlawfully ordered [Petitioner] to serve the eight-year prison sentence, imposed for the merged drug charges, consecutive to the nine-month-prison sentence, imposed in an unrelated conviction, in violation of his rights to due process, guaranteed by Section 10, Article I of the Ohio Constitution and the Fifth and Fourteenth Amendments to the United States Constitution.
>
> [5.] [Petitioner] received ineffective assistance of counsel, in violation of the Sixth Amendment to the United States Constitution and Section 10, Article I of the Ohio Constitution.

*State v. Byrd*, No. 17AP–387, 2018 WL 1448733, *1–5 (Ohio Ct. App. Mar. 23, 2018). On March 23, 2018, the state appellate court overruled all five assignments of error and affirmed the trial court. *Id.* at 869, 871. Petitioner sought an appeal of that determination but on September 26, 2018, the Ohio Supreme Court declined to exercise jurisdiction over the matter. *State v. Byrd,* 153 Ohio St. 3d 1486 (Ohio 2018).

Petitioner filed his petition on September 24, 2019. (ECF No. 1.) In his grounds for relief, Petitioner alleges that his Fourth Amendment rights were violated because the officers that conducted a warrantless search of the box truck did so without probable cause (Ground One). He further alleges that his convictions for drug trafficking and drug possession are unconstitutional because there was insufficient evidence to support the applicable mens rea element of the offenses for which he was charged and convicted (Ground Two).

## II. ANALYSIS

Petitioner's Fourth Amendment claim (Ground One) is not cognizable. Federal habeas corpus relief is not available for an alleged violation of the Fourth Amendment so long as the state provides a petitioner with a "full and fair opportunity to litigate his Fourth Amendment claim in state court." *Henderson v. Wainwright,* Case No. No. 17–3948, 2018 WL, at *3 (6th Cir. Feb 26, 2018) (citing *Stone v. Powell*, 428 U.S. 465, 482 (1976)). For a full and fair opportunity to have existed, the state must have provided, in the abstract, a mechanism by which the petitioner could raise the claim, and presentation of the claim must not have been frustrated by a failure of that mechanism. *Riley v. Gray*, 674 F. 2d 522, 526 (6th Cir. 1982). The opportunity to litigate encompasses more than an evidentiary hearing in the trial court—it also includes the ability to raise the claim on direct appeal of the conviction. *See Rashad v. Lafler,* 675 F. 3d 564, 570 (6th Cir. 2012) (finding petitioner had ample opportunities to present his Fourth Amendment claims in the state courts; the trial court rejected his Fourth Amendment claims on forfeiture grounds because his attorney did not show up at a hearing designed to consider them, and a state appellate court subsequently rejected his claims on the merits). Nevertheless, in *Good v. Berghuis*, 729 F. 3d 636, 638-40 (6th Cir. 2013), the Sixth Circuit held that "[t]he 'opportunity for full and fair consideration' means an available avenue for the

prisoner to present his [or her] claim to the state courts, not an inquiry into the adequacy of the procedure actually used to resolve that particular claim." *Id*. at 639. The Sixth Circuit further stated that "in the absence of a sham proceeding, there is no need to ask whether the state court conducted an evidentiary hearing or to inquire otherwise into the rigor of the state judiciary's procedures for resolving the claim." *Id*.

Here, it is clear that Petitioner was able to present his Fourth Amendment claims to the trial court in his motion to suppress. Petitioner was later able to present his Fourth Amendment claims to the Ohio appellate court. The Ohio Court of Appeals fully considered that claim and then remanded it to the trial court so that it could apply the proper standard—probable cause instead of reasonable suspicion. The Ohio Court of Appeals then considered and affirmed the probable cause determination that the trial court made on remand. This is sufficient to preclude habeas review even if Petitioner alleges that the state courts reached the wrong result on the suppression determination. *Hillman v. Beightler,* Case No. 5:09–CV–2538, 2010 WL 2232635, at *5 (N.D. Ohio May 26, 2010) (citing *Cabrera v. Hinsley*, 324 F.3d 527, 531– 32 (7th Cir. 2003) (explaining that a full and fair opportunity to litigate guarantees the right to present a case, but it does not guarantee a correct result). Therefore, the Magistrate Judge **RECOMMENDS** that Petitioner's Fourth Amendment claim (Ground One) be **DISMISSED**.

### III.    DISPOSITION

For the reasons set forth above, it is **RECOMMENDED** Petitioner's Fourth Amendment claim (Ground One) be **DISMISSED**.

The undersigned further **ORDERS** Respondent to file an answer, motion, or other response to the remaining claim in the petition (Ground Two) in accordance with Rule 5 in the United States District Courts within **SIXTY (60) DAYS** of the date that this Order is filed.

9

Before filing any response to the petition, the Respondent must file those portions of the transcripts needed to adjudicate this case and the state court record in accordance with the provisions of Rule 5(c) and (d) of the Rules Governing § 2254 Cases. When those documents are filed electronically, the Court's CM/ECF filing system will affix a unique PageID number to each page, displayed in the upper right-hand corner of the page. All papers filed in the case thereafter by either party shall include record references to the PageID number. Prior to filing, Respondent's counsel shall ensure that any borders on parts of the record or transcripts (typically, court reporter transcripts) do not obscure the PageID number when the page is filed. The filings shall be indexed by insertion of "bookmarks" in the .pdf version of the state court record uploaded to the Court's CM/ECF system, which display each exhibit and the name of that exhibit in the record.

Respondent must serve Petitioner with complete copies of the response to the petition, transcripts, and the state court record with PageID numbers at the time of filing. Service must be accomplished in accordance with the pertinent provisions of Fed. R. Civ. P. Rule 5(b). If service cannot be accomplished through the Court's CM/ECF filing system, Respondent must file a certificate of service pursuant to Fed. R. Civ. P. Rule 5(d)(1)(B).

Petitioner shall have **TWENTY-ONE (21) DAYS** after Respondent responds to the petition to file and serve a Reply.

The Clerk is **DIRECTED** to serve a copy of the petition and all subsequent filings on Respondent and the Attorney General of Ohio, Habeas Corpus Unit of the Corrections Litigation Section c/o: Brian.Higgins@ohioattorneygeneral.gov and Habeas.docketclerk@ohioattorneygeneral.gov.

## **PROCEDURE ON OBJECTIONS**

If any party objects to this Report and Recommendation, that party may, within fourteen days of the date of this report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s).  A District Judge of this Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made.  Upon proper objections, a District Judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the Magistrate Judge with instructions.  28 U.S.C. 636(B)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the District Judge review the Report and Recommendation *de novo,* and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation.  *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).

                                          /s/ *Chelsey M. Vascura*
                                          CHELSEY M. VASCURA
                                          UNITED STATES MAGISTRATE JUDGE